and Not Dead Yet v. Hopell, 21-2212. May it please the court, my name is Jessica Richwalder and I represent Plaintiff Appellants. Can you pull the microphones closer? Absolutely. The sound system is wretched in here. Is that better? Yes, thank you. Excellent, thank you. This case is about the ongoing harm suffered by chronic ventilator users who are deterred from seeking healthcare during the ongoing pandemic because of a facially discriminatory state policy regarding ventilator reallocation. The New York State Ventilator Allocation Guidelines allow for the personal ventilators of our plaintiffs to be taken from them and reallocated to someone else. They're not binding on the hospitals, right? They are issued as guidelines in order to be flexible and adaptable. Have any hospitals employed them? We haven't conducted discovery yet, so we don't know whether they were employed by hospitals at this time. Okay. The plaintiffs have asked the state to issue an unequivocal statement that no one would be forcibly extubated under the guidelines without another ventilator readily available for their use or in the alternative to rescind the guidelines, but the state has... Have they been issued as an official regulation of the Department of Health state? So they were issued by the Department of Health. It does specifically say in the guidelines themselves that they would not at any point be issued as binding law in order to be... Yeah, so the governor and her now administration may want to do a lot of things, but that doesn't make it law. The threat has to be imminent, doesn't it? And the threat is imminent. The guidelines are called guidelines because that's what they were made... How many times were they employed in 2019, or 21, or 2020, after March 2020? How many times were they employed in the remainder of that calendar year? We don't know. We haven't conducted discovery at this point in the litigation. I think we have just not. We don't know that. You don't know that? No, I don't know that. And you represent an organization of people that feel that they're at risk for that, correct? We represent individual plaintiffs as well as organizations that are... Have any of your clients been denied the continued use of their ventilator as a result of these guidelines? No. Okay. Have any of your clients been threatened with the removal of their ventilators as a result of these guidelines? While they were in a hospital? So our claim isn't based on the guidelines being... I didn't ask you your claim. I asked you, have any of your clients had them removed? No. Have any of your clients been threatened with the removal in a hospital? No, not for this specifically. Our clients have experienced extubation in a hospital. They are not unfamiliar with the medical system by necessity and frequently need to seek health care. And it is routine in some situations for them to be extubated in a hospital. So it's not an unfamiliar thing to take place. But the focus of your claim of actual harm, as I understand it, is deterrence, that your clients are deterred. Yes. So can you... It's a very nuanced argument. So can you take us through that argument? Yes. So the plaintiff's claims is that they are subject to a discriminatory emergency preparedness plan that is facially discriminatory on its face. So in violation of the ADA. And as a result of that plan, they are deterred from seeking health care. And that is a direct harm to them. And that harm itself is recognized in the guidelines and explicitly stated in the guidelines that the state, the Department of Health, the task force recognized. What's the nature of the deterrence? Sorry? How do I... When you say they're deterred, just take me through that. How are your clients actually deterred by guidelines that have not yet been implemented? So there are no further steps of implementation that need to take place in order for a health care facility to enact the guidelines at their facility. The guidelines... Is your argument that your clients are deterred because they would be afraid to go to a hospital, even if they were facing a serious emergency, for fear that their device would be taken away and given to someone else? Yes. So they have been deterred from seeking even routine health care for fear that when they're at a health care facility, they may be forcibly extubated if that facility surpasses... But doesn't that rest on a misunderstanding of the applicability of the guidelines? No. And we think that the state's argument that these guidelines are not applicable now is incorrect and contrary to what the guidelines themselves say. The guidelines themselves say that they are the next step for facilities to take after surge capacity efforts fail. And that there are no further steps and they will not be enacted into law or something like that in order for them... Would you know if they in any way employed post March 14th, 2020 to the end of the calendar year 2020? We don't know if they were employed by... What do you mean you don't know? You would know. You certainly would know if the hospital had done that because they'd have to assert notice, wouldn't they? I don't think I understand that. Do you know of any incidents where a hospital in this state employed these guidelines after March 14th, 2020? No, we haven't been able to conduct discovery yet, so we don't know. Why shouldn't we view these guidelines as just principles that just reify and apply the general principles of triage? That when there's insufficient medical facilities for everybody, then doctors and nurses will decide who is in most need. And your clients may be in certain circumstances disadvantaged, but anybody my age is disadvantaged relative to someone your age and you relative to a child. So what we have here is an accepted, ordinary system that is applied by doctors and nurses. It's certainly applied in the field, in battle. And you're making it into a benefit that is conferred on the people who have a lesser claim to limited medical facilities. So they have a claim to their own personal devices. We're not saying that they should go into a facility and have a right to skip the line for a ventilator that belongs to the facility. But this is their ventilator that they use every day. Do they own it? Yes, they're ventilators. They're using them every day. You can see one of our plaintiffs behind me. What kind of confiscation? It's their ventilator being taken from them and reallocated to someone else, which the guidelines explicitly allow. That they enter the facility for any reason. It's a due process claim then, I guess. It's not a disability-based claim. It's a due process claim. It is, though. The guidelines- If I own a backpack and I walk into a hospital and the hospital says, your backpack is needed for someone else, they take my backpack. A, they may have committed a crime. I don't know how they get the authority to do it. But B, and that the government's authorized them to do it, then they've taken my property without due process of law, haven't they? So this is an emergency preparedness plan. I guess it's because of the health emergency that they may be permitted to reallocate resources, including ventilators. That's what the state is saying, but- Do you concede that in an emergency the government could do such a thing? That's what the guidelines say, is that they will do that in this emergency, is that they will take a person's personal ventilator and they will reallocate it. Do you concede that the government could have an emergency plan? Yes, they do have an emergency plan. And that there might be a limited number of ventilators available for use at that point in time? Yes, that's why there is an emergency plan. And could the government then engage in, in your view, a rationing plan in that regard? Yes, this is a rationing plan. One ventilator for patients ranging in age from 85 to 5. One ventilator. Does the government have an interest? Can the government set forth a rational basis on determining who gets that ventilator? Is it their ventilator, the hospital's ventilator, or is it the person's personal ventilator? Let's start with the hospitals. Yes, and that is absolutely how healthcare is at a hospital. No, let's start with the person. They're 85 years old. It's their ventilator. They're entitled to keep it? Yes. If they- Okay, that's your- Yes, absolutely. That is their personal medical device. And I get to keep my backpack too, I take it? I would argue that you keep your backpack as well. You are classifying this as a benefit conferred by the state on people who don't have these ventilators, right? The ability to take your client's ventilators, or the ability of nurses or doctors to reallocate your client's ventilators, that hasn't happened yet. So what is your standing to complain of the possibility that this might happen? So this is a facially discriminatory policy, and the ADA creates that cause of action. And our clients are deterred from seeking healthcare because there is an emergency preparedness plan that accounts for non-disabled people, but does not account for people with disabilities. Would you agree, just hypothetically, totally hypothetically, so please go with me, that if the guidelines were clearly not implementable, that is not going to be implemented, and the state disclaimed any future application of the guidelines, that that would pose a standing problem? Yes, that's the relief we've requested in this, is that the state disclaimed that the guidelines would be applicable in that situation. We've asked either that they explicitly say that we will not reallocate a personal ventilator in that situation, or that they rescind the guidelines altogether if, as their position has been stated, these guidelines are not. So does your standing argument, that is the argument that your clients have got standing, rest on the notion that the implementation of the guidelines is imminent? The implementation of the guidelines is a made-up condition by the state in defending this claim. So first, again, our claim is based on the guidelines as a facially discriminatory policy, and the guidelines themselves say that they were designed- But in answer to my earlier question- No, I apologize, I was getting there. Okay. The guidelines themselves say that there is no next step that needs to take place. They say that surge capacity proceedings will happen at healthcare facilities, and when those fail, that is why the guidelines are there, that hospitals have asked for consistent statewide guidance because they intend to follow it, and that's why the state created it. And the state put significant resources into creating this policy so that it would be followed, and they have specifically instructed that it should be followed by facilities when they reach that point. Suppose you prevail and these guidelines, as you suggested, would be satisfactory to you, would be rescinded altogether. Now, if such an emergency arises, are you saying that nurses will not have the power and doctors will not have the power to perform the ordinary sorting principles of triage? No, absolutely not. And if they wanted to reallocate, I mean, if these guidelines didn't exist, and they wanted to reallocate the ventilator of a 70-year-old person and give it to somebody who's five, you're saying they can't do that? No, we're saying they can't reallocate a personal ventilator, and the issue is that the- You're saying they can't do that. Somebody comes in and there's a ventilator, and that person's a personal ventilator. You're saying that, that's your real claim here, it seems to me, is that nurses and doctors do not have the power under principles of triage to reallocate resources that are in the hospital, even if they're owned individually. In this one, even if they're owned individually, the people most in need. It's not about the power that the doctors and nurses have. It's about the fact that the state has issued these guidelines which provide these instructions. They would have the power of triage anyway. What do you think happens when there's insufficient medical facilities available after, say, a disaster, an airplane crash, a mass shooting? Under that situation- You pick out the people who are going to be most in need, and you take care of them. Under that situation, there is no plausible way that our plaintiffs survive that, and that is the type of harm that the ADA was created to protect this vulnerable population from, from being either ignored in state programs or cast aside as a casualty of a state program because it is decided that their life is somehow less valuable than that of a person without a disability. Under triage, some people's lives are less valuable than other people's lives. It's horrible, but that's what happens when you have a catastrophe. Under triage, it is not certain that those people would die without their ventilators. It is certain that our plaintiffs would die without access to their personal ventilators. I don't know where the state gets the authority to take them, but I can see when you're competing for a ventilator that the hospital wants, but I don't understand where the state gets the authority to take somebody's existing ventilator. Let's hear from the other side. Thank you. Although I may have another standing question for you, but we'll wait. Mr. Welton. Thank you, Your Honors, and may it please the Court. Cleland Welton for the defendants. The plaintiffs in this case don't have standing to sue because they're attempting to challenge a set of proposed guidelines that have no legal force, no legal effect. Has the state disclaimed the application of the guidelines and explicitly said somewhere that we can latch on to that the guidelines will not be applied? That specific question, I think the answer is yes, but maybe not in an official capacity. There are places that we cite in the- I think you've said it in the brief. Right, exactly. There are news articles and things where we've said the state doesn't have guidelines. These guidelines have not been adopted. Well, don't they appear in the NYCRR? No, I'm not sure they do appear in the NYCRR. The executive order that created the task force, that is in the NYCRR. That is there, and what it says is that the task force has the power to undertake studies and to produce reports, and this, what they produce is a study and it's a report. It's not something that has any legally binding effect. So what's the purpose of it? Just a bureaucratic spinning of wheels? Well, it's a discussion draft, basically. It's something for the legislature to consider, for the executive branch to consider when they're making law and policy, and so they expressly, the guidelines propose that the legislature adopt legislation that would enable these guidelines to be employed in an emergency, but the legislature has not taken that up, to my knowledge, and certainly has not- It's almost like a draft bill or a pre-bill. Exactly, Your Honor. I wouldn't call it a draft bill, but it's a discussion draft for the legislature to consider when they decide whether and in what form to address an emergency plan addressing ventilators. Governor Cuomo, during the beginning of the pandemic, exercised certain emergency powers with regard to closing of schools, etc., etc., and there was a redistribution of some of the ventilators in the state at one point in time because of the need in the city of New York. But for these guidelines to have the force of law, if Governor Honko wanted to have them have the force of law, she would have to comply with the legal procedures with regard to creating some regulations, the state's analog to the administrative procedure law. Wouldn't she have to? Certainly notice and publication, etc. Your Honor, I'm not sure about that. The way they're designed is actually that they propose a modification of the standard of medical care. It sort of goes to your triage point, Your Honor. They suggest that the medical standards can be changed in an emergency when necessary. But for that to work, there has to be legislation that- What else needs to happen for that to be implemented? Exactly, I was getting to that. For it to be implemented, there has to be legislation that would say, you hospital, you doctor, if you comply with these guidelines, then you're immune from lawsuits because no hospital is going to adopt a policy like this that might result in injuries to- How do we know that? I think part of the deterrence argument is that we don't know that. How do we know that no hospital is just going to say, here are these guidelines, we want to implement them in the event of an emergency? Well, the guidelines themselves contemplate that nothing short of actual immunizing legislation is going to be sufficient for hospitals to adopt them. And if you need- Were these guidelines promulgated to hospitals? I'm sorry? Were these guidelines promulgated, sent to hospitals? I think that they were, but they were published online generally. They're generally available in the public documents. I'm not sure that they were sent to hospitals as a directive. In fact, they were not. Well, they weren't a directive. Well, what if they were just best practices? If they were- Promulgated as best practices. They still wouldn't have any binding effect in that situation, and there wouldn't be any chain of events that would lead the plaintiffs to be injured by the guidelines because there's no legal force or effect. And what's the theory under which people who enter a hospital can have a ventilator taken away, or a cane, or a hearing aid, a theory that other people need it more? Well, I mean, that goes, I think, to the merits of their ADA and Rehabilitation Act claims, Your Honor, which haven't been decided. We're just talking about whether there is an injury here, whether there's an imminent injury, and I think that there just isn't because they have not and can't allege that there is any legislation. Is it your view that a fair reading of these proposed guidelines would allow a hospital, if somehow they had the force of law, which we don't have any way to indicate that they do at all at this moment in time, that it would authorize a hospital to take someone's private property? Your Honor, I think that would be, as you suggested, a due process claim, which they haven't raised. You're here on behalf of the state, the Solicitor General's office. You're here as a state official. You're telling me that the state takes a view that they could seize someone's private ventilator? That would go to the merits of a claim that has not even been asserted in this action, and so I'm not able to defend that. There may be circumstances in which they could, but I don't know specifically. That's not even close to within the realm of what is before us, is your view? Yes, exactly, Your Honor. There's no due process claim in the case, and there couldn't be because they've never been threatened with the implementation of these guidelines. Can you help me with this very, I think, interesting deterrence? Are you going to relate it to standing? Because it does seem to me that there may be circumstances under which a guideline that's not yet been implemented or not yet been received the full force of law as a result of legislation can nevertheless be so misleading that it will actually deter people who might be subject to it from taking certain actions. And where the state is unclear about its posture with respect to the guideline, and under those circumstances, why isn't that sufficient actual harm? Because I think that that is really the argument here. Well, Your Honor, I think in that kind of situation, what you have to have, what the cases say, is a well-founded fear that something is going to be enforced adverse to your interests, and they don't have that here, and they can't have that here. So why can't deliberate ambiguity constitute or be the basis for a well-founded fear? That is, deliberate ambiguity on the part of the state. I mean, your friend on the other side has said the state hasn't said anything one way or the other. Well, I think, as you suggested, it's a misunderstanding on their part, and it's from not reading the guidelines and not reading the executive order correctly. The executive order does not give the task force power to make law or to change the standard of care or to do anything that would cause them harm. All they can do is undertake studies, and that's what they've done here. They have not done anything that would create an injury, and if they are afraid that legislation might be enacted in the future that would cause them injury, then they're- But you're also saying that the hospital, no hospital, no care facility, will have any incentive to implement these guidelines just for itself without the immunity provision that could only be provided by legislation. Right, Your Honor, exactly. So no hospital is going to adopt these and- Imagine the malpractice insurers would be interested in- Exactly. The malpractice insurers, the doctors, everyone, if you try and apply a different standard of care than would ordinarily apply without some legal backstop, you're facing malpractice liability, you're facing criminal liability, you're facing professional liability. Nobody's going to do that without legislation that's never been enacted. Let me give you a hypothetical. Suppose the guidelines said that anybody who enters a hospital for an operation is consenting to the removal of a kidney and the allocation of it to somebody who is in greater need, since you only need one, you don't need two. Wouldn't that provide a disincentive for people to enter the hospital? Well, it might, but you need to have a well-founded, but you need to have a well-founded fear that whatever the policy is is actually going to be enforced against you. Well, depending on the level of deprivation and the consequences of deprivation, the level of fear you need drops. I mean, there are a lot of people afraid to get on an airplane because they're worried about accidents, which are very rare. But your adversary's argument is that if this happens to one of her clients, they'll die. Well, right, Your Honor, but that sort of ironically is exactly why- Yeah, and that is why there could be a disincentive to go to a hospital in a mass emergency. But if there's a disincentive, it's not a well-founded one, but it's what's required. There's nothing in the law that suggests that the hospitals are required to do this, or that they will do this, or that the standard of care has been changed. And so there's no well-founded reason to believe that anything is going to be taken away from the plaintiffs or others in their position, because that's just not what the law says, and no insurer is going to allow- This just doesn't have the force of law yet. I don't understand how we get a controversy when the state proposes something to think about and some people are concerned about it. I can understand their concerns, but I don't understand how their injury arises from their concern when it doesn't have the force of law yet. I don't either, Your Honor. The House and the Assembly, until it gathers the necessary votes, it has no force of law. It might be concerned to interest groups. They lobby against it. It's not a violation of the ADA, because one legislator proposes something that might be an anathema to another group of people within the public. But this has no force of law. Exactly, Your Honor. I think you're exactly right. There's no force of law. There's no change to the common law of medical malpractice. This is- Anything. You sent Roberts to us, and we haven't heard from your opponent. You take it that Roberts precludes a reversal here? I'm not sure it strictly precludes it, because it's a summary order and it's not binding. Roberts is the rationing of COVID medicines, correct? Right. It's virtually the same fact pattern, and there's no standing there, there's no standing here. Non-binding- It's the same situation, where it was playing out the possibilities of when rationing might occur. There was a lawsuit about it, and a panel of this court said not imminent. Well, right, Your Honor. I think if there's a distinction between the cases, it favors us. In Roberts, there actually was briefly a period where there wasn't enough COVID medicine. Correct. And they were rationed. Here, these guidelines have never been adopted or applied at any point by any hospital. They've never been invoked by the state. There's just no injury- Well, if a hospital chose to do it on its own, the fact that the state may have suggested it, I don't know how the state- But that's another matter. In that case, they could sue the hospital. The state has indicated that it has not in any way set forth in process any attempt to put this into the NYCRR's law, correct? Correct, or into the statute book, certainly. I will sit down, but I just wanted to raise the statute of limitations issue, if the court's interested in that. But if not, then I'm glad to- Why don't you have a seat? Thank you so much. Thank you. You might want to lower that. That'll be better for you. Yeah. Thank you. I'd like to first begin with the force of law point that was just recently discussed with my opposing counsel. And if I can, I'd like to read directly from the guidelines themselves. This is appendix page 68 that discusses why these are not a regulation or a piece of legislation. So, quote, a clinical ventilator allocation protocol must be designed to allow for sufficient flexibility to adjust to changing clinical information. The static nature of regulation or legislation makes these an inadequate approach for clinically detailed recommendations. For this reason, guidelines are preferable in this instance, end quote. So the guidelines themselves recognize that they cannot be legislation or a regulation- Is that what you're telling us? No, I'm saying that they exist to guide and provide a procedure for these hospitals. But that they cannot be more formal because the task force decided that then they wouldn't be able to amend them when needed. Does a hospital have to follow these guidelines? No, but they've indicated that they will. And we did have a hospital, it's in our complaint, that stated that they were planning to enact the guidelines when their surge capacity procedures failed. And so that is a perfect example of the deterrence that our clients are facing in this situation. Were they referring specifically to this provision or to the guidelines generally? Well, they were discussing the ventilator allocation protocol. Have they adopted it? We don't know if they adopted it. You don't know, but you know that they were talking about it, but you didn't follow up? They made a public statement that they would implement the guidelines. When did they make that public statement? I don't have the specific date. It is in our complaint. It was in mid-2020, around that time. Mid-2020? So in the last two years, you don't know whether they've adopted it or not? Do you know of any other hospitals that have adopted it? No. And how many hospitals are there in the state of New York? A lot. I don't know a specific number. You don't know? I don't know a specific number. You're the plaintiff. I understand. Okay. You are contradicting your adversary's statement that these guidelines constitute food for thought for the legislature if it wishes to adopt legislation, and you're saying that this is as far advanced as this is going to get. Yes. These are the guidelines that are being promulgated for the guidance of hospitals faced with insufficient medical equipment. Yes. This is a several-hundred-page document that underwent a comment period, reviewed by experts in the legal field, the medical field. These were not something that was simply drafted, or like in the Roberts case, an email that was sent out to advise people about what to advise the facilities about a specific situation. These were created in anticipation of a pandemic because the guidelines recognize that a respiratory pandemic is imminent and is likely to occur. You're assuming state officials, correct? Yes. Where is the state stamp of approval of these guidelines? It's on the front page of the guidelines where it says that these are drafted by the New York State Department of Health. But they specifically say they're voluntary, non-binding guidelines. So how is the state, the agency, that's somehow then driving this? I mean, the hospitals are free to accept or reject these things. I'm reading from the same page. The risk is so substantial. The words are voluntary, non-binding. The risk is so substantial in this case that a hospital will follow these guidelines, that it is reasonable for our plaintiffs to be deterred and be harmed by these guidelines in not seeking medical care during the ongoing pandemic and during any future respiratory pandemic. What's the relief, the rescission of the guidelines? We've asked for a statement, something as simple as a statement from the state that a person will not be forcibly extubated from their own personal ventilator without another, perhaps a facility ventilator, available for their use. That's the simple relief we've requested. And we would put to the court some questions that it did seem like you were getting at with my opposing counsel. If this is not a policy of the state, if this is not guiding their response to the pandemic, then why have they not taken that step? Why does this still appear on their website, and why did they put such substantial work into creating it if this is not something that they're going to follow? How does your argument adjust itself to the possibility that the ventilator is not purchased by the individual but is issued by the state under Medicaid or some other arrangement? It's still their personal assistive device that they use every day. And so it goes back to the point that they're not on an equal playing field when they go into the hospital because another person doesn't need that ventilator to survive as a baseline every day. And so they are disadvantaged and discriminated against under this plan. In terms of triage in the event of an emergency that overwhelms hospital facilities, people are not on a level playing field. People in their 50s are going to be disadvantaged relative to people in their 20s and so on, down to people who are 5. And they're not explicitly named in the guidelines as being forcibly extubated, which would lead to their death. Again, they would have a chance to survive without the ventilator therapies. There is no situation in which our plaintiffs survive without their ventilators that they need to live day to day. Is everyone who has such a ventilator a person who owns it personally? Some own it. Some rent it. Some receive it through their insurance company. They are different, but it is their personal assistive device. If they get it through their insurance company, they don't own it. But you're saying if it's personal, it doesn't matter. Whether they own it or whether it's been allocated to them through a program or an insurance company or whatever. Right. Their assistive technology that they use every day, like a person's wheelchair, a diabetic's insulin, their personal medical device that they use to live every day. It is their personal device. Let me just go back to the standing issue again. What if the governor commissions a task force to look into an issue, a voting rights issue? Let's take it away from the disability rights for a second. And the task force of prominent members of the community within New York, the legal community within New York, comes up with a report, issues a report that's to the governor, saying these are our views, these are our recommendations, and the recommendations have some impact on voting rights that some group strongly disagrees with and that the group believes will disadvantage members of that group. Okay? And the governor says, thank you very much for your report. Would any group have standing to sue based just on the report given to the governor who had commissioned the task force to issue the report? I understand your question. I do think that it depends on what language would be in the report. It says the task force. The beginning says this is a task force commissioned by the governor of the state of New York. These guidelines are not just from the task force. They are from the Department of Health. Their name is on the front page. It is throughout the document. The then commissioner was a member of the task force, and they- They're clearly, I mean, it can't be clearer. They say they're non-binding and voluntary. At the end of that paragraph reads, the task force, this is A68, the task force recommends the enactment of new legislation granting the New York State Commissioner of Health authority to adopt a modified medical standard of care specific to the emergency coupled with civil and criminal liability protections and professional discipline protections for all health care workers and entities who provide care in a pandemic emergency. There's no-this is-of course, this is a task force that tried to project out what should happen, what might happen during a situation in which there are limitations on ventilators. But there's no way that you can twist the language, voluntary non-binding guidelines into something that requires a hospital to do something, nor have you identified anything to that effect. Now, it might make people nervous. I get that. But is that sufficient controversy to give you Article III standing under the Constitution? I have serious doubts. And I think a key to our argument is in something you just said, is that we haven't argued that these guidelines require hospitals to follow them, that they will somehow be punished, fined, or something like that if they don't. But if there is an ambiguity- A public official says that they're going to strongly support a policy measure. People oftentimes alter their behavior because of it. It does not make what he or she said actionable. We think that it is reasonable, and with the substantial risk that it exists, that it is reasonable for our plaintiffs to believe that facilities would follow the guidelines issued by the Department of Health, the entity that regulates them. So notwithstanding the fact that the task force was charged with trying to figure out what might have to happen and how they ought to play it out, and then at the end of that discussion saying you really can't rely on these, these are non-binding and these are voluntary. And furthermore, there are significant legal concerns because courts may not necessarily take this as a standard of care, and there are significant concerns about liability. That's what the paragraph says. The resolution of this is legislation. You think that that then somehow has enough force to it, that that alters the behavior of hospitals, none of which you've identified have adopted these guidelines in the last two and a half years? Yes, we do, and we think that there is an ambiguity on how these guidelines are read, whether they're read as- But that was my question. Sorry. So your entire argument seems to me to rest on an ambiguity relating to the guidelines and their applicability. So if there is an ambiguity, we would argue that it should go in our plaintiff's favor because of the magnitude of the harm that they face under these guidelines, which is death. And I'm certain you'd have a tidal wave of hospitals that have probably adopted them because they read it wrong, but you don't have that. Is there a decision where we have embraced this idea that deterrence arising from a misunderstanding of a set of guidelines or whatever it is, a misunderstanding that itself arises from some ambiguity, and in this case the effect of the guidelines, that that can qualify as actual or imminent harm? We haven't- For purposes of Article III standing? We haven't briefed the issue of a misunderstanding, so I don't have a case, but we don't think that the guidelines are ambiguous, but for argument's sake, if we find that they are, then, again, we still think that that should weigh in our favor because of the magnitude of the harm that our plaintiffs would face. But the guidelines are clear, and at no point has the state said that they don't say that a person's personal ventilator will be taken from them. It is plainly stated in the guidelines that if they report to a health care facility at a time of triage, then it will be taken from them, and the state hasn't refuted that point. They've just said that basically they're not following these guidelines, but they've refused to take that action. But isn't the context of the guidelines, based on what has been read, mean that hospitals are not going to do this unless legislation is passed that gives them some immunity from lawsuits for doing what is recommended in the guidelines? No, we would say that the context of the guidelines says that they are to be enacted by hospitals. Now, the frequently asked questions, which accompany the guidelines, ask that question. What do you make of the recommendation that hospitals need immunity? The guidelines also discuss that a statewide policy provides the facilities with that type of protection in some ways, which is why the facilities asked for it. They expressed that they would rather have a statewide policy that they can follow and point to in an issue of liability, malpractice, concern, than come up with their own policies, which may be inconsistent with the hospital across the street or across the town. The state's response is this is voluntary, and you should be very careful to rely on these, because some courts may not accept them as a standard of care. And so, therefore, legal liability may be imposed upon you. And the only way to truly resolve that is through the legislature. That's the state's response. The state's response was to issue the guidelines that the hospitals asked for, which is what this document is. Okay. Great. Okay. Thank you very much. Very helpful. We'll reserve the decision. And we'll hear argument next in INRIG Tronics Incorporated, 21-627. Thank you.  Hold on one second. Good morning, Your Honors. May it please the Court. I'm Brian Killian on behalf of the appellants. The district court erred as a matter of law in holding that Ashworth's claims arose after the Tronics bankruptcy because the court failed to apply the physical events test of Texaco and Duplian. Under that test, an environmental claim arises when all the physical events necessary to establish the elements of the claim occur. And those were? Well, in Duplian, it's tortious conduct, causation, and injury. Well, I'm talking about here in Tronics. Sure. And those were the release of Creosote alleged in Mr. Ashworth's complaint before 1963, and then the contamination of his property before 1996. The bankruptcy was in 2000. He alleges that his property was contaminated before 1996? Correct. He alleges that it was contaminated sometime between 1984 and 1996, which is 13 years before the bankruptcy. Okay. And that's paragraph one of the complaint? 41. Most of these facts, Your Honor, I can give you a couple of paragraphs, but the key one is paragraph 41 of the complaint. All right. I got it. Yep. So those are, as this court said in the Duplian case, as long as you have tortious conduct and causation and injury, all three of the facts alleged in Mr. Ashworth's Louisiana complaint, then you have an accrued claim under the Duplian standard. The district court, and as I said, this is not really meaningfully disputed in this case. The district court didn't disagree with our application of the physical events standard. The district court believed that a different test applied for determining when Mr. Ashworth's claims arose. The court purported to apply the contact or relationship test from this court's decision in Motors Liquidation I, but there are three problems with what the district court did in applying that test. First, the contact or relationship test is for contingent claims, that is, claims where there is no pre-petition injury, where the injury happens after the bankruptcy. But in Mr. Ashworth's case, he alleges a pre-petition injury when he alleges that his property was contaminated before 1996. Second, even if the test were to apply in a situation like this, the contamination of Mr. Ashworth's land satisfies the test. As this court recently said in the John Manville case that we cited in the 28J letter, exposure constitutes the contact or relationship, and that is exactly what we have argued in this case. The exposure of his property to creosote, as he alleges, before 1996 constitutes the contact or relationship. Or to put it in a different way, the way this court said in the Chateau Gay decision, that a relationship is one that is known in the law. Well, a relationship in tort arises from a tortious injury, as he alleges here. There is no additional contact or relationship required beyond the exposure. Isn't that a bit circular? I mean, the relationship always exists whenever there's a tort. Absolutely right. I don't know. I call that circular, Your Honor. If I encounter a random person on the street and injure him, then I now have a relationship to him. And so it gives rise to the tort. So that is exactly what the standard is driving at. When you have tortiously injured someone, there is a relationship. That is the type of relationship, in other words, that the court is looking for when applying the contact or relationship test. Well, environmental claims are difficult in some ways because of the fact that they're not always they may be knowable, but they're not always known because of the fact that it's subsurface water pollution. That's correct. And so the problem becomes clearly, I mean, the difficulty we have with a lot of these is that there's a disconnect between the definition of claim and when someone might be able to bring a cause of action to collect on what the state law, how the state law defines a cause of action, and it's different from the idea of claim. In trying to sort all these things out, the cases seem to work on, did the debtor do something that ultimately injures the claimant? That's the problem with Tronics, and that was the problem with Tronics 4 because the claimants tried to, the plaintiffs tried to recast their claims as to acts of new curve of gain. Correct. And Judge Etkin, I think, got that right in terms of his understanding of what we were trying to work on. And so they were trying to cast it as conduct post-petition. In the Tronics 4 case. And that's the problem in old GM, is their conduct post-petition by new GM. Correct. For which the free and clear order didn't give them free and clear. Exactly, but in this case, there's no such. And new GM sat on the defect and didn't disclose it. Until five or six years after the bankruptcy. So their conduct then exposed them outside of- The debtor's conduct, yes. Correct. So the critical question here is, is his allegation, well, two critical questions to my mind. Okay. Is this allegation that appears at page 108 of the joint appendix where he asserts- Paragraph 41, yeah. The timing of his injury. Yes. He's the one that's made these dates. So your claim is, okay, then that's clearly pollution caused by the debtors. He's exactly right. And to be specific, the debtors who own the property before 1963. Because it's 30 years pre-final judgment, right? 13 years pre-petition. 13 years pre-petition. Yes, yes. At the latest. All right. And so it's easily then traceable to the accident, not of a successor. That's correct. Only the Tronics debtors, former selves, owned and operated the de Ritter facility. As the complaint itself alleges in paragraphs 5, 6, or 7. But here's my problem. Okay. How does he know, how does he know that he has to file a claim before the bar date? Well, that's a question of due process, Your Honor. I do think that's a distinct issue. Because if the notice is no good, then there's a problem with the extinguishment of his claim. Because there's always, I've had enough of these. They drive me crazy. So there's always a question of do they have a claim? Step one. That's what we work out in Tronics and we work out in other cases. Old GM works it out nicely, does a very nice job of working through it. As does Due Plan. And Chattagay does a nice job with it. Okay. But then there's a separate question. All right. So they did have a claim. Yes. But then the question is were they made aware of it? Because somebody doesn't always know. Well, can I tweak Your Honor's question? Because I don't think the due process question is whether the debtor had an obligation to make the creditor aware of the creditor's claim. Under Mullane, the standard articulated there, it is the debtor's obligation to try to make others aware of the bankruptcy proceedings. Now, there are many reasons. No, I agree with you there. I agree with you there. But let me ask you this. If the reason that he knew that his property had been polluted in 84 or 96 was because in 2020, a hydrologist told him this pollution has been going on for a long period of time. Not that he actually knew in 84 or 96, but that he knew he was subsequently told that it was that. Now, it's still a claim. Correct. That still puts it pre-petition. Absolutely. Right. But does he know in the sense of that a notice then would trigger in his mind that he should file a claim? So I'll walk through the analysis this way, Your Honor. Because he's five miles away. I keep thinking of it. I sold my home a few years ago, and I moved five miles away. And that seems like a hell of a long ways to me. It's a distance, Your Honor. But depending on the nature of the contaminant, it may not be that big. So I don't know that there's something magical about the specific distance. I'm going to walk back to your question on due process in a moment because I do want to point out in the Texaco case itself, one of the families there. I'm aware of that. But that's a bankruptcy court, and they're interesting but not binding. Well, other than that, it was fully endorsed by this court in in re due plan. And I just would point out one of the families there lived two miles away. Yeah, I'm aware. It's 2.1. Just about. And had no other contact with the debtor except for the pollution underneath the land. And the bankruptcy court, admittedly, not this court, held that the claim was a claim and that that person was entitled only to publication notice. Because he, at the notice level. The junction was oil production, I think, right? Yeah, they were PCEs. Oil extraction. Correct, correct. That navigated. Oil extraction in the general area in which they lived. 2.1 miles away, Your Honor. That's a pretty big distance, too. This is a fellow living in someplace near DeRider. Correct. Louisiana, wherever that is. Correct. And he's five miles away from a plant. And the question is, did he know or should have known? Or, well, there's a question, to my mind, on the notice side, not so much, maybe. On the claim side. Okay, so if you want to talk. The question of knowledge typically comes up in the context of a statute of limitations or prescription, right, under state law. And there's going to be more to that inquiry than just when did he flip over the stump in his land and find creosote. There will be a question, for instance, that the DeRider site was listed by the Louisiana Department of Environmental Quality, according to his own complaint. There's a question of detectability. I'm sorry, Your Honor. Of detectability. The detectability is a distinct question from whether he had an awareness of what was potentially under his property at the time. There's never been a dispute in this case that it was detectable. And, indeed, he alleges in his complaint that creosote was actually detected at the DeRider site and that the migration was detected. He alleges in his complaint that DeRider's principal drinking water supply was known and found to be contaminated in the 1990s. So to Your Honor's question about five miles, you know, I don't think we need to decide that right now in this case. But if we had to talk about knowledge, there's going to be evidence that there was a general awareness in the community, which may very well have been enough to put him on notice. For due process purposes, the question ultimately looks at the debtor, right? The debtor's ability to provide notice. And as the Third Circuit held, we think persuasively in the Chemitron decision, which involved, I'd say, an analogous situation with a uranium radioactive site that was near a residential neighborhood. Many years afterwards, it became clear that there was a potential for radioactivity. And there were claims brought not just by the residents of the neighborhood, but by their occasional visitors. There was no way that they would have known. Some of them, I think, had actually moved away to Texas at the time, according to the Third Circuit's decision. And in the practicalities of bankruptcy at that point, there's a possibility of a claim. We don't know. It may be specific because I don't represent the debtor. The debtor doesn't know what other people know or don't know. All the debtor can do is put out a publication notice. And in this case, the publication notice, as both Judge Gropper found several years ago and as Judge Wiles recently found in the 2021 decision, where he resolved some claims brought by 38,000 other late claimants, was massive. There were 80 local newspapers. 66,000 notices, I think. Correct. There were national newspapers. The federal government put this in the Federal Register, which all of us citizens are presumed to have notice of, because the federal government was involved in this settlement as well. The notice campaign was extensive. So, you know, do we know why he didn't bring the claim? Maybe he knew about it and chose not to. Maybe he didn't get the notice. But that's sort of the practicality at the end of the day in bankruptcy, that there are some people who will not bring their claims and yet to achieve the finality that bankruptcy desires so that the debtor can move on and know what is and is not discharged, some people who did not participate are not going to have their claims. But as you point out, this is not a claim against the debtor. No, it's not. He mentions the debtor in his complaint. Two of the defendants identified in the complaint are the debtors. And then he is now also sued in a darko and occidental as the debtor's successors. But, yes, it's true. So we're dealing sort of with this hybrid situation where you have the original bankruptcy and then the adversary proceeding that came a few years afterwards. Would you agree with me? Well, I don't want to ask you to agree with me. Let me ask you this question. If the pollution didn't reach his property until after the petition, such that his injury occurs post-petition? It would be a contingent claim at best, yeah. It would not be covered by in re du plan, which requires the pre-petition injury. So his claim would not be against the estate. It would be against the successors? Well, I think it would be. Yes, if the estate ceased to exist, it would be. Successor liability, it works when the only acts are the acts of the predecessor and the injury occurs. Correct. But when the acts may be pre-petition, pollution, but the injury is post-petition, in other words, the pollution doesn't reach his property until 2022. Sure. That's a classic contingent claim like in the asbestos scenario where someone inhales a fiber that was put in place by an asbestos. Even if he'd read the notice, he didn't have a claim at that moment in time. Well, he had a contingent claim potentially if there was a contact or relationship, as indeed the court just recently held in the Johns Manville case. In pollution cases, the contact relationship, that analytical paradigm doesn't work for me. I mean, I understand it when you're buying something, but when you've got an exposure that's not seeable, it's underground, it's insidious, and my hypothetical is specific to post. The pollution occurs post-petition. I understand. So I'll take your hypothetical, but if I could get back to my other point. In your hypothetical, we would not be able to demonstrate the in re du plan standard because the third factor, detectable pre-petition injury, you're taking away in the hypothetical. At that point, I think we would be at best in the contact or relationship standard. Was there something else that would have created the contact or relationship, as in, say, the Texaco case or other cases where there were commercial relationships involved? So it's not just because we failed to plan, and we don't, but if we failed to plan in your Honor's hypothetical, it's possible that there would still be a claim in a bankruptcy sense  Could being a neighbor be the kind of relationship that would matter in this context, rather than, say, who bought a used car? Could being simply close to the property? I don't know that- Being a neighbor. I mean, why wouldn't that substitute, why wouldn't that be the kind of relationship that would give somebody notice that they could be suffering the harm? So in taking the hypothetical of there's no contamination of the property, but you know what's happening on your neighbor's property, then I think we would argue that that would satisfy the contact or relationship standard, and indeed I believe- Exposure is sufficient contact. Absolutely. Yeah, but in the hypothetical that I've been asked, exposure's been taken away. There's no pre-petition exposure. So I'm trying to give you an example of what would satisfy the contact or relationship test when there is no exposure. Exposure is a great case for contact or relationship. Well, yeah, that's the asbestos case is like the case we- It is. So I wanted to- Close petition, okay. Yes, exactly. So I wanted to take Your Honor's question about the analogy and why environmental cases I don't think actually are that different from asbestos cases. I concede that the contamination will be subsurface, but like asbestos, the inhalation of asbestos fiber is basically unknown to the individual until he or she eventually develops something like asbestosis or mesothelioma. Indeed, there's really no way to determine that- Unknown and unknowable. I gather that's the case. I don't know enough about asbestos science, but when someone takes in a fiber, it is quite possible that they will live to be 90 years old and die of natural causes and never develop any of the injuries that give rise to a torsional injury. But they're more likely to know about the exposure. That's true with regard to the wives sometimes, but the husbands who come home from the Brooklyn Navy Yard, I tried a dozen of those- There are easy and there are hard cases, yeah. And then the case that we just had- Mrs. Berry's case. But there, I realize that the injury's not knowable for a long period of time because it's cumulative, but at least it's knowable about the contact with the agents, the agency of injury. And so you're working in a place, John's Mansion plant, and the fibers are all over the place. Absolutely. And it's easy to know when you get notice of the fact that you work there that you should file a claim. But this is different in the sense that it's subsurface. It's not, and it's five miles away. But it's knowable. I think that's the key point. It's knowable. If you had tested, it would have been there. It's not like the asbestos case. Let me ask you a question. Do you know what's going on underneath the property in your home? Only in a few small spots where I have a well. But I take your Honor's point. But it's knowable. You just don't. I could look. And that's the key difference. And if I can give you a hypothetical that- You could look because somebody says you noticed that in the newspaper that says, oh, there was a creosote plant five miles away. You might be concerned about it. Sure. That's one reason why. But there may be other reasons why. But guess what? So what if you looked when you got the notice? You got the notice. What was the year of the notice? Of the original bankruptcy, the bar date was in 2009. Okay, 2009. And then the injunction was 2014. You got the notice, and you had a test done, and the well tested negative. Okay? And now, in 2014, your well is filled with creosote. That's still a contingent claim. That's the hypothetical we just went through where the exposure happens after bankruptcy. So you got notice. What good was the notice? Well, you may not have a claim depending on whether you had a contact or relationship besides the exposure, right? I would suggest you had no contact or relationship, which helps you a little because you didn't have a claim until your well was filled with creosote. But I think, Your Honor, it's going to be case specific, right? There are community meetings about things that are happening. I grew up in a town with a Superfund site that was not near my house, but I knew it was a Superfund site because it was a small town. There are things that can put people on notice within any community, big or small. And I think you would need to go case specific in those situations. But if I could, Jordan. I'm going to give you one minute from your friend, and then you've reserved some time. I reserve two minutes for rebuttal. I'll try to do a very brief wrap-up for Your Honor. So we think his claim arose as a matter of law before the bankruptcy, and two conclusions follow when the court corrects Judge Atkin's mistake. First, his claims are clearly enjoined as pre-petition claims. And second, the due process problems that Mr. Ashworth has actually raised.